1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

FLOYD STEVESON MOODY,

                                    Plaintiff,

        vs.

PAULETTE FINANDER, Chief Medical
Officer, *et al.*,

                                    Defendants.

CASE NO. 09-CV-0892-LAB (BGS)

**REPORT AND
RECOMMENDATION TO GRANT
DEFENDANTS PAULETTE
FINANDER AND K. BALL'S
MOTION FOR SUMMARY
JUDGMENT**

## I. INTRODUCTION

Plaintiff Floyd Moody, a California state prisoner currently incarcerated at Pleasant Valley State Prison ("PVSP"), proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. §1983. On June 4, 2009, Plaintiff filed a First Amended Complaint against Paulette Finander, K. Ball, Richard Butcher, and Manorama Reddy[1], alleging that he received inadequate medical care in violation of the Eighth Amendment[2]. (Doc. No. 4.)

Currently pending before the Court is a motion for summary judgment filed by

---

[1]Erroneously sued as Manoram Reddy.

[2] Plaintiff also asserted a conspiracy claim in his First Amended Complaint, which was dismissed without leave to amend by the Court in an Order dated April 1, 2011. (Doc. No. 38 at 12-13, n.2.)

Defendants Paulette Finander, Chief Medical Officer at Lancaster State Prison, and K. Ball, Chief Medical Officer at Calipatria State Prison, pursuant to Fed.R.Civ.P. 56.[3] (Doc. No. 105.) Plaintiff filed a response in opposition on March 1, 2011.  (Doc. No. 119.)  Defendants Finander and Ball filed a reply in support of their motion on March 14, 2011.  (Doc. No. 122.) On August 1, 2011, the Court issued an order pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir.1998) (en banc) and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir.1988) warning Plaintiff that Defendants' motion for summary judgment seeks to have the case dismissed and allowing Plaintiff an opportunity to supplement his opposition in light of the notice. (Doc. No. 139.) Plaintiff did not file a supplemental opposition by the due date of August 19, 2011.

Also pending before the Court is Plaintiff's motion to continue pursuant to Fed.R.Civ.P. 56(f)[4], filed on January 27, 2011, *nunc pro tunc* to January 3, 2011.[5]  (Doc. No. 111.)  Defendants Ball and Finander filed a response in opposition to the motion to continue on January 31, 2011. (Doc. No. 113.)  As an initial matter, the Court denies Plaintiff's motion to continue.  Plaintiff was given an opportunity to supplement his opposition following his request to continue with any supplemental documents. (Doc. No. 139.)  Plaintiff failed to do so.  Additionally, Plaintiff's request to continue focuses on a document that supports his allegations of a conspiracy between defendants.  These allegations were dismissed without leave to amend.  Therefore, Plaintiff has been able to present facts essential to justify his

---

[3]In conjunction with their motion for summary judgment, Defendants filed a request for judicial notice of two expert declarations submitted with Defendant Butcher's separately filed motion for summary judgment. (Doc. No. 105-7.) Plaintiff did not oppose this request.  The Court grants the request and takes judicial notice of the declarations of Colin M. Haggerty, M.D. and Lawrence Bogle, III, M.D.  (Doc. No. 105-7, Exs. A & B.)

[4]Plaintiff cites Fed.R.Civ.P. 56(f) as the basis for his request for a continuance.  However, effective December 1, 2010, Fed.R.Civ.P. 56(d) is the provision of the Federal Rules of Civil Procedure that concerns requests to continue motions for summary judgment when facts are unavailable to the nonmovant.

[5]Plaintiff's motion to continue does not specifically address what motion he seeks to continue, as Defendant Butcher and Defendants Finander and Ball filed motions for summary judgment. The date the Court received Plaintiff's motion to continue, January 3, 2011, pre-dates Defendants Finander and Ball's motion for summary judgment. However, because both Defendant Butcher and Defendants Finander and Ball filed oppositions to the request to continue, the Court addresses Plaintiff's request in relation to Defendant Finander and Ball's motion for summary judgment.  In a separate order, the Court addressed Plaintiff's motion to continue in relation to Defendant Butcher's motion for summary judgment.  (*See* Doc. No. 140.)

1    opposition and a continuance of this matter is not appropriate.

2         This matter has been referred to the undersigned Magistrate Judge for a Report and

3    Recommendation (R&R). For the reasons set forth below, the Court **RECOMMENDS** that

4    Defendants Finander and Ball's motion for summary judgment be **GRANTED**.

5                              **II. FACTUAL BACKGROUND**

6         On April 16, 2008, Plaintiff was transferred to Lancaster State Prison from the Los

7    Angeles County Jail.  (Doc. No. 105-6, Moody Depo. at 15:19-16:7.) On April 23, 2008, a

8    liver panel was performed on Plaintiff, which showed elevated liver enzymes that are

9    suggestive of cirrhosis. (Doc. No. 105-5, Finander Decl. ¶3.) Based on the elevated enzymes,

10   Plaintiff received an abdominal ultrasound at Lancaster Imaging on July 3, 2008.[6]  (*Id.* ¶3, &

11   Ex. A.)  The ultrasound report indicated elevated liver enzymes and showed a 4 cm ill-defined

12   lesion in his central right liver lobe.  (*Id.*, Ex. A.) The ultrasound report noted the lesion could

13   be a benign or malignant tumor or fatty infiltration.  (*Id.*, Ex. A.) The report recommended a

14   CT or MRI for further evaluation.  (*Id.*, Ex. A.)

15        On July 25, 2008, Dr. Finander, the Chief Medical Officer and Chief Medical Executive

16   at Lancaster State Prison, signed a physician request for services form requesting the

17   recommended CT scan.  (*Id.* ¶4.) On August 4, 2008, Plaintiff received the follow-up CT scan

18   of his abdomen.  (*Id.*, Ex. C.)  The CT report noted Plaintiff's clinical history of Hepatitis-C

19   and elevated alpha-fetoprotein levels.  (*Id.*, Ex. C.)  The report stated, "[t]here is an ill-defined

20   and irregular hypoechoic mass in the anterior liver slightly to the right side of the epigastric

21   region, approximately 4 cm in size, which corresponds to the abnormality seen on ultrasound."

22   (*Id.*, Ex. C.)  The report also noted other slightly irregular areas of liver density without any

23   measurable or definable geographic boundaries, and indicated that these findings may be

24   representative of underlying heterogeneity of the liver parenchyma due to the patient's

25

26        [6]Defendants state that Plaintiff was admitted to Lancaster Community Hospital ("LCH") on
     July 3, 2008.  Plaintiff disputes this.  Defendants have not provided evidence that Plaintiff was
27   admitted to LCH on July 3, 2008.  The record provided for July 3, 2008 by both Plaintiff and
     Defendants is an ultrasound report from Lancaster Imaging.  (Doc. No. 105-5, Ex. A; Doc. No. 119-
28   14, Ex. I.) The Court, however, finds that whether Plaintiff was admitted to the hospital and then
     received an ultrasound is immaterial.

Hepatitis C status and chronic disease.  (*Id.*, Ex. C.)  Based on the confirmation of the presence of an abnormal mass within the liver, a biopsy was recommended to confirm or exclude the presence of hepatocellular carcinoma.  (*Id.*, Ex. C.)  On September 9, 2008, Dr. Finander signed a physician request for services form requesting the recommended biopsy, which was approved on September 12, 2008.  (Doc. No. 119-14, Ex. I at 7.)

On September 19, 2008, Plaintiff was taken to Lancaster Community Hospital for additional tests to confirm or exclude the presence of hepatocellular carcinoma in his liver. (*Id.*, Ex. I at 8-15; Doc. No. 105-5, Ex. D.)  Dr. Viken Manjikian performed the additional tests.  At 10:09 a.m., Plaintiff received an upper abdominal sonogram, which detected the presence of a "poorly marginated 4X5 cm sized mass possibly representing a hemangioma on the left side of the liver."  (*Id.*, Ex. D)  At 1:19 p.m. on the same day, Plaintiff received an abdominal CT scan, which detected a lesion in the left side of the liver that was less likely to be malignant by its early characteristics, as well as a smaller lesion in the right side of the liver that was "highly suspicions for malignancy."  (*Id.*, Ex. D.)  The CT scan report noted that the lesion in the right lobe was not described in any other prior CT or ultrasound report.  (*Id.*, Ex. D.)  A biopsy was recommended for both the right and left liver lesions.  (*Id.*, Ex. D.)

At 1:30 p.m., Plaintiff received the recommended biopsy of the left liver mass to determine whether the mass was hepatocellular carcinoma.  (Doc. No. 119-14, Ex. I at 11.) The diagnosis report from the left liver mass stated, "[n]eedle biopsy of left liver mass shows, moderate fatty infiltration, extensive portal triaditis, with bridging fibrosis and early cirrhosis suggestive of marked steatohepatitis, possibly superimposed on Hepatitis-C infection."  (*Id.*, Ex. D.)

At 2:27 p.m., Plaintiff underwent a right liver biopsy.  (*Id.*, Ex. D; Doc. No. 119-14, Ex. I at 13.)  The report of the procedure stated that after five attempts of appropriate access site targeting, the procedure was discontinued because accessing the lesion with accuracy was not possible with the patient's current sedation status.  (*Id.*, Ex. I at 13-14.)  Dr. Manjikian recommended arranging anesthesia for the patient in order to proceed with the biopsy under controlled conditions and noted that "the biopsy of this slight liver lesion is very urgent as this

is the likely malignancy and likely hepatoma or hepatocellular carcinoma by its features and imaging characteristics." (*Id.*, Ex. I at 14.) A second biopsy of Plaintiff's right liver was never completed at LCH.

On October 10 and 20, 2008, Plaintiff had chronic follow-up visits with Dr. Fitter and Dr. Wu. (Doc. No. 119-14, Ex. I at 16-17.) Both of the visit reports indicate that the prison was still waiting on the biopsy results from LCH. (*Id.*) While awaiting the biopsy results, Plaintiff saw a cardiologist as he was having chest pain. (Doc. No. 105-5, Finander Decl. ¶7.) On October 23, 2008, a myocardial perfusion test was performed. (*Id.*, Ex. E.) The test results were abnormal, showing the left ventricle was enlarged. (*Id.*, Ex. E.) Plaintiff also had GI bleeding and was scheduled for an EDD and colonoscopy to find out the cause. (*Id.*)

Lancaster received the biopsy results and lab tests on November 3, 2008 and were discussed with Plaintiff the same day. (*Id.* ¶8; Doc. No. 1119-14, Ex. I at 20-21, 23.) Plaintiff's treating physician, Dr. Fortaleza, consulted with Dr. Finander regarding the biopsy issue and based upon this conversation, Dr. Finander understood that a follow-up biopsy was being ordered. (*Id.*, Ex. I at 21; Doc. No. 105-5, Finander Decl. ¶8.) Dr. Finander believes that the repeat biopsy was not ordered between November 3 and December 1, 2008 due to an oversight given all of Plaintiff's other medical problems. (*Id.* ¶8.) Plaintiff testified at his deposition that Lancaster's failure to order a biopsy of the right mass was because the prison did not read the documents carefully enough and did not realize that Plaintiff had not had a biopsy of the right liver mass. (Doc. No. 105-6, Moody Depo. at 52:6-12.)

On December 1, 2008, Plaintiff was interviewed in connection with a 602 inmate appeal he filed regarding the biopsy issue and based on the interview, Nurse Practitioner Gocke put in a request for an urgent liver biopsy, under anaesthesia, for the right liver lesion. (Doc. No. 105-5, Finander Decl. ¶9; Doc. No. 119-14, Ex. I at 23; Doc. No. 119-15, Ex. J at 13.) Plaintiff was transferred to Calipatria State Prison on December 4, 2008. (Doc. No. 105-5, Finander Decl. ¶10.) On December 9, 2008, Dr. Finander granted in part Plaintiff's appeal and referred Plaintiff for another liver biopsy. (Doc. No. 119-14, Ex. I at 23.) Dr. Finander avers that she took no part in the decision to transfer Plaintiff to another institution and did not put a medical

hold on Plaintiff as his medical needs, including a follow-up biopsy, could be handled at another institution. (Doc. No. 105-5, Finander Decl. ¶10.) Plaintiff admitted in his deposition that he did not file a grievance regarding his transfer. (Doc. No. 105-6, Moody Depo. at 78:18-23.)

A new arrival physician referral sheet from Calipatria dated December 4, 2008, notes the December 1, 2008 request for services for an urgent liver biopsy and the recommended biopsy from the September 19, 2008 radiology report. (Doc. No. 119-14, Ex. J at 1.) Dr. Ball, Chief Medical Officer and Health Care Manager at Calipatria State Prison, received a letter from Plaintiff dated January 1, 2009, in which Plaintiff explained that he was supposed to have had a biopsy of a mass in the right lobe of his liver at Lancaster, he did not receive the biopsy, and was concerned that he had liver cancer. (Doc. No. 105-3, Ball Decl. ¶4.) In response, on January 2, 2009, Dr. Ball ordered an urgent MRI with gadolinium and an EGD. (*Id.* ¶5.) Dr. Ball requested Dr. Hjerpe, her chief surgeon and physician, to review Plaintiff's medical records to find out what happened with the biopsy at Lancaster. (*Id.* ¶5, & Ex. A.) Dr. Hjerpe completed a physician request for services, requesting a cardiology evaluation, a biopsy of the right liver mass, and a colonoscopy. (*Id.* ¶5, & Ex. B.) Based upon this request for services, Dr. Ball approved Plaintiff's transfer to Alvarado Hospital for medical evaluation and treatment. (*Id.* ¶5, & Ex. C.)

On January 8, 2009, Dr. Butcher admitted Plaintiff to Alvarado to evaluate his complaints of chest pain and liver concerns. (Doc. No. 105-3, Ex. D.) Plaintiff received a 2-D echocardiogram that was reported by cardiologist Dr. Zamudio. (*Id.*) The echocardiogram showed mild concentric left ventricular hypertrophy and no valvular abnormalities present. (*Id.*) After receiving Dr. Zamudio's report, Dr. Butcher noted in his transfer summary that Plaintiff's cardiac status was unremarkable with a normal echo and normal enzymes. (*Id.*)

Dr. Tuan Nguyen saw Plaintiff for evaluation of the status of cirrhosis and liver cancer. (*Id.*) Plaintiff received a dynamic 3-phase CT scan without and with contrast of his abdomen and pelvis on January 11, 2009. (*Id.*) After reviewing the results of the CT scan, Dr. Butcher noted in his transfer summary that "[n]o hypervascular liver mass or other evidence of

hepatocellular carcinoma noted.  It was felt that the patient does have cirrhosis, but no hepatocellular carcinoma." (*Id.*, Ex. D.) The CT scan did not show a lesion in the right lobe of the liver.  (*See id.*, Ex. D.) It is not uncommon for someone with cirrhosis to have masses which appear and disappear.  The liver tries to repair itself, but because those with cirrhosis do not have normal livers, the liver grows back with fat, scarring, and often with nodules. (Doc. No. 105-5, Finander Decl. ¶12.) It is a dynamic process and a nodule may appear and then disappear.  (*Id.*) Plaintiff admitted at his deposition that he learned during his hundreds of hours of research that liver masses sometimes disappear.  (Doc. No. 105-6, Moody Depo. at 88:9-89:15.)

Dr. Butcher's discharge diagnoses included chest pain, atypical; malignant hypertension; cirrhosis of the liver, no evidence of liver cancer; depression; and alcohol abuse. (Doc. No. 105-3, Ex. D.)  The transfer summary noted Plaintiff's lab results indicated elevated alpha fetoprotein levels.  (*Id.*, Ex. D.)  Dr. Butcher found Plaintiff okay to be discharged back to the facility and recommended that Plaintiff lie in for the next two weeks and have no work detail.  (*Id.*, Ex. D.)  Dr. Butcher noted that Plaintiff should follow up in the medical clinic in one week's time and that he was okay for general population.  (*Id.*, Ex. D.)  Dr. Butcher also noted that:

> [H]e had several long and extensive conversations with the patient who believes that he has hepatocellular carcinoma stating that he has seen the records and that this is what it states.  The patient would not be convinced despite having a negative CT guided biopsy that did not show this and now a repeat triple phase CT scan does not show any evidence of hepatocellular carcinoma. The patient is at risk for developing this with a history of cirrhosis.  His enzymes are elevated.  The patient continues to think that there is something positive. Will just have him follow up there with GI.  Would also have him at least have a repeat of his liver enzymes and alpha fetoprotein in a 3 month period.

(*Id.*, Ex. D.)  Plaintiff was discharged on January 14, 2009.  (*Id.*, Ex. D.)

On January 20, 2009, Plaintiff was transported on an emergency basis to Pioneer Medical Center after he was found down in his cell.  (*Id.* ¶7, & Ex. F.) Plaintiff continued to insist that he had not been properly tested for liver cancer and complained of right upper quadrant pain.  (*Id.*, Ex. F.) Based on these complaints, it was agreed that Plaintiff could be transferred back to Alvarado for an additional work up.  (*Id.*) Dr. Manorama Reddy admitted

1    Plaintiff to Alvarado and noted in her transfer summary that Plaintiff still thought he has

2    hepatocellular carcinoma and thought there were some discrepancies with the diagnosis from

3    Lancaster and his previous visit to Alvarado Hospital.  (*Id.* at 1-2.)

4         On January 22, 2009 Plaintiff received an MRI of his abdomen without and with

5    contrast that was compared to his CT scan from January 11, 2009.  (Doc. No. 105-5, Ex. F.)

6    The findings of the MRI led to an impression of focal fatty infiltration of the left lobe of the

7    liver, no liver mass, and otherwise unremarkable abdominal MRI with contrast.  (*Id.*)  Dr.

8    Reddy noted in her transfer summary that Plaintiff was explained the diagnosis from the MRI

9    findings multiple times and finally accepted that he does not have liver cancer, but still thought

10   there were discrepancies from his workups at Lancaster and Alvarado.  (*Id.*)  Dr. Reddy stated

11   that she tried to explain to Plaintiff again that the MRI scan did not show any masses, so there

12   was no need for a biopsy at that time.  (*Id.*)

13        On January 23, 2009, Dr. Ball, after reviewing the transfer summaries, wrote Plaintiff

14   a note to assure him that he did not have a liver mass, that he had a thorough work up, and

15   there was no reason to lie or mislead him.  (Doc. No. 105-3, Ball Decl. ¶8, & Ex. G.)   Dr. Ball

16   was satisfied with the work up done at Alvarado and had no reason to believe that it was not

17   competently performed.  (*Id.* ¶9.)  Dr. Ball was satisfied that Plaintiff did not have liver cancer

18   and in a letter dated February 23, 2009 encouraged Plaintiff to put in a sick call slip to see his

19   primary care physician, Dr. Estock, to address any other concerns as Dr. Estock was

20   responsible for Plaintiff's daily care. (*Id.* ¶9, & Ex. H.) While he was at Calipatria, Plaintiff

21   did not advise Dr. Ball that he wanted to begin treatment for Hepatitis C or cirrhosis.  In any

22   event, Dr. Ball would not have been involved in those decisions, as those treatment decisions

23   would be reached between Plaintiff and his primary care physician.  (*Id.* ¶10.) Dr. Ball avers

24   that she never met or examined Plaintiff.  (*Id.* ¶10.)

25        On March 12, 2009, Plaintiff was transferred from Calipatria to Corcoran State Prison,

26   whose officials took over Plaintiff's care.  (*Id.* ¶11.) Since that time, Plaintiff has undergone

27   five CT scans of the abdomen at various institutions, none of which revealed a right lobe mass.

28        On March 15, 2009, Plaintiff was evaluated by Dr. Jeffrey Marino at Mercy Hospital

Bakersfield. (Doc. No. 105-5, Ex. G.) While at Mercy Hospital, Plaintiff received a repeat CT scan of his abdomen and pelvis, which showed no acute findings, and specifically did not show a pelvic mass. (*Id.*)

On May 21, 2009, Plaintiff was again evaluated at Mercy Hospital and received a CT scan of his abdomen and pelvis. (Doc. No. 119-16, Ex. K at 8.) The report from the CT scan noted a lesion within segment 5 of the liver that had increased in size, which demonstrated trace heterogenous enhancement and was not a benign hemangioma. (*Id.*) The report also noted that a fine needle aspiration biopsy may be of use for the patient. (*Id.*) On May 27, 2009, Plaintiff received a repeat triple-phase CT scan of his abdomen without and with contrast and a CT guided liver biopsy. (Doc. No. 105-5, Exs. H & I.) The CT scan report noted that the findings of the scan were consistent with focal fatty regeneration in segment 5 of the liver and that the focal mass effect is a large regenerating fatty area. (*Id.*, Ex. H.) Segment five is in the left lobe of the liver. (*Id.* ¶15.) Two small benign and incidental hemangiomata were also found and were too small to be biopsied. (*Id.*, Ex. H.) A biopsy of the left lobe mass was performed, which resulted in no evidence of malignancy and a diagnosis of chronic Hepatitis C grade 3 and stage IV cirrhosis. (*Id.*, Ex. I.) The report recommended a followup CT scan in six months. (*Id.*, Ex. H.)

On June 30, 2009, Plaintiff was again seen at Mercy Hospital and received a follow-up CT scan of his abdomen without and with contrast. (*Id.*, Ex. J.) The CT scan was compared to the scan from May 27. The June 30 report noted that there was no change from the May 27 scan. (*Id.*, Ex. J.) The CT scan report noted an impression of focal fatty infiltration in segment 5 of the liver, which appeared unchanged and stable. (*Id.*, Ex. J.)

On October 6, 2009, Plaintiff underwent another CT scan of his abdomen by Truxton Radiology Medical Group. (*Id.*, Ex. K.) The CT scan report noted a lesion in the left lobe. Dr. Girish Patel noted that the lesion could represent a hemangioma or a primary or mestastic tumor. (*Id.*, Ex. K.) Dr. Patel also noted that the same location had been biospied, which showed only moderate fatty infiltration. (*Id.*, Ex. K.) The report did not mention a lesion in the right lobe. (*Id.*, Ex. K.)

On December 21, 2009, Plaintiff received another CT scan of his abdomen without and with contrast at Salinas Valley Radiologists. (*Id.*, Ex. L.) Dr. Nathanson performed the scan and noted in his report that, "[d]espite the extensive clinical history and apparent findings elsewhere, I am unimpressed with any active disease of the liver or lymph nodes and certainly none can be seen elsewhere either." (*Id.*, Ex. L.)

On August 18, 2010, Dr. John Chokatos at Pleasant Valley State Prison evaluated Plaintiff's past medical records and wrote: "I explained to [Plaintiff] that the evidence for a hepatoma that was growing in his liver is nonexistent. I explained to him that the latest CT scan of his liver showed no mass. I explained to him that his alpha fetoprotein had decreased from a value of 35.1 in April 2005[7] to the present value of 26.4, which was obtained 7/26/2010." (*Id.*, Ex. M.)

Plaintiff, in his First Amended Complaint ("FAC") alleges that from September 19, 2008 to December 1, 2008 Dr. Finander ignored the recommendation to have the right liver mass urgently tested, despite Plaintiff's 602 grievances. (Doc. No. 4 at 3.) Plaintiff alleges that on December 1, 2008 prison officials agreed that they had "omitted the recommendation of the hospital." (*Id.*) According to Plaintiff, instead of treating the situation, Dr. Finander medically released Plaintiff to be transferred to a different prison while knowing that Plaintiff was at risk. (*Id.*) In his opposition, Plaintiff argues that Dr. Finander violated the procedure and general requirements of departmental policies by transferring Plaintiff to a non-medical designated general population prison, Calipatria. (Doc. No. 1119-3 at 4.) He also argues that it was Dr. Finander's duty to ensure that all follow-up care was completed, and her failure to respond to the recommendation of a follow-up biopsy was deliberate indifference. (*Id.* at 8, 10.) Plaintiff also asserts that Dr. Finander failed to treat his cirrhosis and Hepatitis C and this led to his condition enhancing to stage IV liver disease. (*Id.* at 11.) Plaintiff also testified in his deposition that his claims against Dr. Finander include that he did not get a biopsy of the

---

[7]Plaintiff disputes this date, as he was not transferred to Lancaster State Prison until April 2008, when he had a liver panel completed. The Court finds this dispute immaterial; whether the correct date is April 2005 or April 2008, it shows that Plaintiff's alpha fetoprotein levels decreased while incarcerated.

right liver lesion, he did not get treatment for Hepatitis C, he did not get treatment for cirrhosis, and that he did not get treatment for any cancer that he did not know whether he had.  (Doc. No. 105-6, Ex. A, Moody Depo. at 129:3-130:6.)

In his FAC, Plaintiff alleges that Dr. Ball, as Chief Medical Officer of Calipatria, intentionally ignored the urgent recommendation to biopsy the right liver mass, while knowing that if left untreated it would produce a premature death.  (Doc. No. 4 at 4.)  Plaintiff alleges that despite seeing his condition worsen and being able to see the liver with "the naked eye protruding thru [sic] the right side," Dr. Ball refused to treat this medical condition, which has resulted in severe pain and mental/emotional distress disorders.  (*Id.*)  Plaintiff does not make specific arguments concerning Dr. Ball's care in his opposition, as he focuses his arguments on Dr. Finander and the care he has received at other institutions.  (*See* Doc. No. 119-3.)  At his deposition, Plaintiff testified that his claims against Dr. Ball are that she should have known that the various reports from Alvarado were discrepant and gotten Plaintiff further testing and she should have treated Plaintiff for Hepatitis C and cirrhosis.  (Doc. No. 105-6, Ex. A, Moody Depo. at 130:7-25.)

### III. LEGAL STANDARDS

**A.  Summary Judgment**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©). A material fact is one which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party. *Id.*

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Where the

movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant has sustained its burden, the nonmoving party must "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (citing *Anderson*, 477 U.S. at 257) (emphasis in the original). Although the nonmoving party need not establish a material issue of fact conclusively in its favor, it may not simply rely on "bald assertions or a mere scintilla of evidence in [its] favor" to withstand summary judgment. *Stefanchik*, 559 F.3d at 929. Indeed, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Rather, "the evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255; *see T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Inferences, however, are not drawn out of the air; it is the nonmoving party's obligation to produce a factual predicate from which the inference may justifiably be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985).

**B.  Eight Amendment–Inadequate Medical Care**

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). The Eighth Amendment's cruel and unusual punishments clause is violated when prison officials are deliberately indifferent to a prisoner's serious

medical needs. *Estelle*, 429 U.S. at 105. "Medical" needs include a prisoner's "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

To show "cruel and unusual" punishment under the Eighth Amendment, the prisoner must point to evidence in the record from which a trier of fact might reasonably conclude that Defendant's medical treatment placed Plaintiff at risk of "objectively, sufficiently serious" harm and that Defendant had a "sufficiently culpable state of mind" when he either provided or denied him medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (internal quotations omitted). Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

Although the "routine discomfort inherent in the prison setting" is inadequate to satisfy the objective prong of an Eighth Amendment inquiry, *see Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 1999), the objective component is generally satisfied so long as the prisoner alleges facts to show that his medical need is sufficiently "serious" such that the "failure to treat [that] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (quotations omitted).

However, the subjective component requires the prisoner to also allege facts which show that the officials had the culpable mental state, which is "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "Deliberate indifference" is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Inadequate treatment due to "mere medical malpractice" or even gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106; *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

Moreover, a difference of opinion between medical professionals concerning the appropriate course of inmate treatment or care is not enough, by itself, to support a claim of deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Nor does a

difference of opinion between the prisoner and his doctors constitute deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). And, while deliberate indifference can be manifested if a doctor or prison guard intentionally denies or delays access to medical care or otherwise interferes with medical treatment already prescribed, *see Estelle*, 429 U.S. at 104–05, the delay must also lead to further injury or be somehow harmful. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (noting that harm caused by delay need not necessarily be "substantial"), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

## C.  Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Under the PLRA, all available administrative remedies must be exhausted and such remedies "need not meet federal standards, nor must they be 'plain, speedy[ ] and effective.' " *Id.* (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). The PLRA's exhaustion requirement requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Procedural exhaustion is now required "regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible." *Booth*, 532 U.S. at 739. Broadly stated, the purpose of the PLRA exhaustion requirement is to "afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 525.

California provides its prisoners the right to appeal administratively "any departmental decision, action, condition or policy perceived by those individuals as adversely affecting their welfare." Cal.Code Regs. tit. 15, § 3084.1(a). To exhaust available administrative remedies within this system, "a prisoner must proceed through several levels of appeal: (1) informal resolution; (2) formal written appeal on a [CDCR] 602 inmate appeal form; (3) second level appeal to the institution head or designee and (4) third level appeal to the director of the

[CDCR]." *Barry v. Ratelle*, 985 F.Supp. 1235, 1237 (S.D.Cal.1997); Cal.Code Regs. tit. 15, § 3084.5.

The first level of appeal, or informal resolution, is bypassed when the prisoner complains of alleged misconduct by a departmental peace officer. Cal.Code Regs. tit. 15, § 3084.5(a)(3)(G). The second level of appeal "shall be completed prior to the appellant filing at the third formal level." *Id.* at § 3084.5(c). A final decision from the director's level of review satisfies the exhaustion requirement under § 1997e(a). *Id.* at § 3084.1(a).

## IV. DISCUSSION

### A. Plaintiff's Claims against Defendant Finander

Plaintiff alleges that Defendant Finander violated his Eighth Amendment rights by failing to cause the recommended biopsy of the right liver mass to be completed, failing to place a medical hold on Plaintiff to keep him at Lancaster State Prison, and failing to treat Plaintiff's Hepatitis C, cirrhosis and cancer.  In the motion for summary judgment, Defendant Finander does not challenge the objective basis for Plaintiff's Eighth Amendment claim, and therefore the Court will not address the objective prong.  (*See* Doc. No. 105-1.)  Rather, Defendant Finander's arguments concern the subjective prong, whether any delay was harmful, and administrative exhaustion.   The Court addresses Plaintiff's claims against Finander in turn.

#### 1. Biopsy of the Right Liver Mass

Defendant Finander argues that Plaintiff's allegations cannot satisfy the subjective or deliberate indifference requirement, as the records and evidence demonstrate that Defendant Finander was not deliberately indifferent to Plaintiff's medical needs. (Doc. No. 105-1 at 7-9.) Dr. Finander argues that, in any event, Plaintiff cannot demonstrate he suffered any harm as a result of the failure to obtain a biopsy of the right liver mass in 2008, as he does not and has never had liver cancer.  (Doc. No. 105-1 at 9.)

The Court agrees with Defendant Finander and finds that the record before the Court does not show any triable issue as to the subjective component of an Eighth Amendment inadequate medical care claim against Defendant Finander for the failure to arrange the biopsy

of the right liver mass.  *See Frost*, 152 F.3d at 1128; *Farmer*, 511 U.S. at 837. In order to justify trial, Plaintiff must point to evidence in the record to show that Defendant Finander was "deliberately indifferent" to his serious medical needs, *i.e.*, that she knew, yet consciously disregarded Plaintiff's pain or the need to provide him constitutionally adequate care. *See McGuckin*, 974 F.2d at 1060. This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839.

Although Plaintiff claims that from September 19, 2008 to December 1, 2008 Dr. Finander ignored the recommendation to have an urgent biopsy completed of the right liver lesion, Plaintiff fails to offer any factual support or evidence supporting this claim.  The evidence submitted shows the results of the biopsy were not obtained by Lancaster until November 3, 2008.  (Doc. No. 105-5, Finander Decl. ¶8; Doc. No. 1119-14, Ex. I at 20-21, 23.) The report of Dr. Fortaleza from November 3, 2008, indicates that he discussed the biopsy issue with Dr. Finander.  (*Id.* at 21.) Dr. Finander avers in her declaration that based upon this conversation with Dr. Fortaleza, she believed that a follow-up biopsy of the right liver lesion was being ordered.  (Doc. No. 105-5, Finander Decl. ¶8.) Plaintiff testified at his deposition that Lancaster's failure to order a biopsy of the right mass was because the prison did not read the documents carefully enough and did not realize that Plaintiff had not had a biopsy of the right liver mass.  (Doc. No. 105-6, Moody Depo. at 52:6-12.)  Dr. Finander states in her declaration that she believes the reason why a biopsy was not ordered between November 3, 2008 and December 1, 2008 was due to an oversight given Plaintiff's other medical conditions. (Doc. No. 105-5, Finander Decl. ¶8.)

This evidence does not give rise to a triable issue of fact that Dr. Finander acted with deliberate indifference in connection with the recommendation for a follow-up biopsy. Plaintiff's reliance on the CDCR policy and procedures manual for his argument that it was Dr. Finander's duty to ensure the recommendation was followed is misplaced.  (*See* Doc. No. 119-3 at 4; Doc. No. 119-8, Ex. D at 11.) Plaintiff relies upon a section of the manual concerning temporary transfers to other CDCR institutions for care, which does not apply to the facts of this case as it relates to a receiving institution's CMO's duties prior to return of the

inmate-patient to the sending institution.  (*See id.*, at 13.)  There is no evidence that prior to November 3, 2008, Dr. Finander was aware of facts to draw an inference that a follow-up biopsy was recommended, that she did in fact draw the inference, and that she then consciously disregarded the need for medical care.  Plaintiff admitted in his deposition that as of November 3, 2008, nobody at Lancaster knew of the results of the biopsy. (Doc. No. 122-4, Ex. A, Moody Depo. at 61:13-16.) Once she was aware of the recommendation, Dr. Finander believed, based upon her conversation with Plaintiff's treating physician, that a biopsy was being ordered. Plaintiff's own testimony that he believed the prison did not read the documents carefully enough gives rise to at most a claim of negligence, which is insufficient to support an Eighth Amendment claim. *Estelle*, 429 U.S. at 106. Finally, when it was brought to the prison's attention that the biopsy had not yet been ordered, Nurse Gocke immediately requested it on December 1, 2008.  (Doc. No. 105-5, Finander Decl. ¶9; Doc. No. 119-14, Ex. I at 23, Ex. J at 13.)  On December 9, 2008, Defendant Finander granted in part Plaintiff's appeal and referred Plaintiff for another liver biopsy.  (Doc. No. 119-14, Ex. I at 23.)  The record before the Court does not offer any evidence that Dr. Finander deliberately ignored the recommendation for a follow-up biopsy of the right liver lesion.

Additionally, there is no evidence that the failure of Defendant Finander to cause Plaintiff to receive a follow-up biopsy while incarcerated at Lancaster resulted in any harm to Plaintiff.  The medical records before the Court demonstrate that Plaintiff has never been diagnosed with liver cancer.  The mass that was noted in the right lobe of the liver in September 2008 had disappeared by January 2009, and therefore there was nothing to biopsy. Plaintiff argues that the Mercy Hospital CT scan report from May 2009 noting a lesion in section 5 of the liver had increased in size demonstrates harm that occurred from the delay in receiving a biopsy.  (Doc. No. 119-3 at 5.) Plaintiff has offered no medical evidence establishing that an increase in size of the left liver lesion, which was found by biopsy to have no evidence of malignancy, would have been prevented from receiving a biopsy of the right liver lesion or that the enlargement of the lesion caused him harm.  While Plaintiff generally complains of a "protrusion" and pain, he has submitted no medical evidence indicating that this

- 17 -

protrusion is liver cancer nor that his pain is a consequence of untreated liver cancer. Defendant Finander explains that the swelling is caused by an accumulation of fluid in the peritoneal cavity and is known as "ascites." (Doc. No. 105-5, Finander Decl. ¶13.)  Medical records submitted by Plaintiff show that this swelling is secondary to cirrhosis. (Doc. No. 119-17, Ex. L at 3, 8.) Plaintiff has not offered any other contradictory medical evidence that the failure to have a follow-up biopsy of the right liver lesion identified in September 2008 was detrimental to his health or caused him further harm.[8] *See McGuckin*, 974 F.2d at 1059; *cf. Fleming v. Lefevere*, 423 F.Supp.2d 1064, 1070 (C.D.Cal.2006) ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of fact because he has not shown that he has any medical training or expertise upon which to base such an opinion."). Therefore, there was no delay or interference with treatment of liver cancer, as Plaintiff did not have liver cancer during his stay at Lancaster.

Because there is no evidence in the record to support Plaintiff's allegations that Dr. Finander consciously disregarded the recommendation for a follow-up biopsy and no evidence that Plaintiff suffered any harm as a result of the failure to have a follow-up biopsy at Lancaster, the Court finds no genuine issues of material fact exists as to whether Defendant Finander acted with deliberate indifference to Plaintiff's serious medical needs.  Accordingly, the Court recommends granting the motion for summary judgment on Plaintiff's claim against Defendant Finander for ignoring the biopsy recommendation.

### 2.  Failure to Place a Medical Hold on Plaintiff

Defendant Finander argues Plaintiff's claim that she violated his Eighth Amendment rights by failing to place a medical hold on Plaintiff to prevent his transfer to Calipatria fails because Plaintiff did not exhaust his administrative remedies. (Doc. No. 105-1 at 9.)  Plaintiff admitted in his deposition that he did not file a grievance regarding his transfer to Calipatria. (Doc. No. 105-6, Moody Depo. at 78:18-23.) Plaintiff has offered no contradictory evidence

---

[8]In his opposition, it appears Plaintiff attempts to argue he was harmed because he is afraid he has cancer and has psychological damage. (Doc. No. 119-3 at 6, 13-14.)  However, the PLRA precludes recovery for emotional injury unaccompanied by physical injury.  42 U.S.C. §1997e(e).

that he did exhaust his administrative remedies with respect to his transfer nor that the grievance system was unavailable to him regarding this matter. Instead, Plaintiff argues that his appeal seeking the follow-up liver biopsy was sufficient to put officials on notice that immediate care was needed and that further appeals would be futile like the rest of his appeals. (Doc. No. 119-1 at 8, ¶22.)

The Court finds that Plaintiff's 602 appeal on his liver biopsy did not exhaust his administrative remedies regarding his transfer to another institution. His request for a follow-up biopsy did nothing to exhaust any complaint concerning a transfer to a different institution. Furthermore, the record shows that Plaintiff's appeals were not futile, as his appeal requesting the liver biopsy was partially granted after an interview with Nurse Gocke. (Doc. No. 119-14, Ex. I at 23.) Because Plaintiff never filed a grievance regarding his transfer, corrections officials never had the time and opportunity to address Plaintiff's complaints internally. *Porter*, 534 U.S. at 525. Therefore, Plaintiff's claim against Defendant Finander for failing to place a medical hold on Plaintiff fails on this ground.

Alternatively, Defendant Finander argues that Plaintiff's claim against Defendant Finander for failing to place a medical hold on Plaintiff fails on the merits. Defendant Finander avers that she was not involved in the decision to transfer Plaintiff to Calipatria and there was no need to place Plaintiff on a medical hold. (Doc. No. 105-5, Finander Decl.¶10.) Plaintiff has not offered any contradictory evidence that Defendant Finander was involved in the decision to transfer him to Calipatria. Instead, Plaintiff argues that the policies and procedures manual called for a medical hold to be placed on Plaintiff and his transfer to a non-medical designated general population prison violated his rights. (*See* Doc. No. 119-3 at 4.)

Plaintiff's contentions regarding policies and procedures does not give rise to a triable issue of fact as to whether Dr. Finander was deliberately indifferent by failing to place a medical hold on Plaintiff. The medical hold policy states that the RN shall notify the PCP and the HCM/CMO when it appears that a medical hold is necessary. (Doc. No. 119-8, Ex. D at 10.) Plaintiff has submitted no evidence that Defendant Finander received such a notification, which would tend to show Defendant Finander's knowledge of the need for a medical hold.

The policy provides that a hold is necessary when "an appointment is scheduled" and the appointment is for a "major medical procedure or Specialty Consult scheduled within the next two weeks that the receiving institution is unable to reschedule within thirty (30) days of arrival." (*Id.* at 11.)  The record before the Court establishes that no appointment was scheduled for the follow-up biopsy when Plaintiff was transferred to Calipatria.  Nurse Gocke signed a request for services for the follow-up biopsy on December 1, 2008.  (Doc. No. 119-14, Ex. I at 23.)  Plaintiff was transferred on December 4, 2008.  (Doc. No. 105-5, Finander Decl. ¶10.)  The request for services was approved on December 9, 2008.  (Doc. No. 119-14, Ex. I at 23.)  Plaintiff has not offered contradictory evidence that he had an appointment for the follow-up biopsy when he was transferred.  Additionally, Plaintiff's complaint that he was transferred to a non-medical general population facility does not give rise to a triable issue of fact regarding Defendant Finander's failure to place a medical hold on Plaintiff.  Plaintiff received a full work-up at Alvarado Hospital following his transfer to Calipatria and has not submitted any evidence that he would have received different or better care at Lancaster State Prison.  Therefore, there is no evidence Plaintiff suffered any harm as a result of the transfer to Calipatria.

As Plaintiff failed to exhaust his administrative remedies and there is no evidence supporting the allegation that Defendant Finander was required to place a medical hold on Plaintiff, let alone evidence of deliberate indifference regarding such a duty, the Court recommends granting the motion for summary judgment on Plaintiff's claim against Defendant Finander for failure to place a medical hold on him.

### 3.  Failure to Treat Plaintiff's Hepatitis C

Defendant Finander asserts that she was not deliberately indifferent to Plaintiff's serious medical needs by failing to treat Plaintiff for his Hepatitis C.  (Doc. No. 105-1 at 10-11.)  In support of this argument, Defendant Finander avers in her declaration that the drugs used to treat Hepatitis C are powerful with many known unpleasant side effects, which required Plaintiff to have a psychological evaluation prior to starting treatment as Interferon and Ribivarin have been known to cause acute depression and suicide. (Doc. No. 105-5, Finander

Decl. ¶21.)   Additionally, the side effects of the drugs required Plaintiff's other medical problems to be addressed before any treatment could begin.   (*Id.* ¶21.)   A psychological evaluation of Plaintiff was attempted at Lancaster on November 18, 2008 to clear him for treatment of Hepatitis C.   (*Id.* ¶21, & Ex. N.) Dr. Shnayder, the psychiatrist performing the evaluation, found Plaintiff to be uncooperative and noted the interview should be rescheduled in one month. (*Id.* ¶21, & Ex. N.) Plaintiff was transferred to Calipatria on December 4, 2008. Therefore, no psychological evaluation was completed prior to his transfer.   Plaintiff's other medical issues, including hypertension, heart condition, recently diagnosed diabetes, and blood in his stool, also prevented Plaintiff from beginning the Hepatitis drugs.   (*Id.* ¶21.)   Plaintiff submits the Inmate Medical Services Polices and Procedures Hepatitis C Chronic Care Program, which sets forth that an absolute contraindication of Hepatitis C treatment is "life determining illnesses," including poorly controlled cardiopulmonary diseases and diabetes mellitus. (Doc. No. 119-8, Ex. D.) Defendant's position is further supported by Dr. Moon's, a doctor at California State Prison-Corcoran, conclusion in June 2009 that Plaintiff had absolute contraindications to starting Hepatitis C treatment. (Doc. No. 119-25, Ex. O5 at 7-8.)

Plaintiff has offered no conflicting medical evidence that Lancaster's decision to not start Hepatitis C treatment during his incarceration at Lancaster was deliberately indifferent or that it caused him harm.   Plaintiff's disagreements with Dr. Shnayder's evaluation of Plaintiff and the need for Dr. Shnayder's approval prior to starting treatment do not give rise to a triable issue of fact on Defendant Finander's alleged deliberate indifference.   A difference of opinion between the prisoner and his doctors does not constitute deliberate indifference. *Jackson*, 90 F.3d at 332.   Furthermore, there is no evidence of harm to Plaintiff caused by Lancaster's decision not to start him on Hepatitis C treatment.   Plaintiff had medical issues preventing the commencement of treatment in 2008, and was found not to meet the criteria for beginning treatment in June 2009.   Based upon the evidence presented, the Court finds there is no genuine issue of material fact as to whether Defendant Finander's failure to treat Plaintiff for Hepatitis C was deliberately indifferent and therefore recommends granting the motion for summary judgment on this claim.

### 4. Failure to Treat Plaintiff's Cirrhosis

Defendant Finander avers that there is no treatment for cirrhosis, and therefore argues she could not have been deliberately indifferent by failing to treat Plaintiff for cirrhosis. (Doc. No. 105-5, Finander Decl. ¶21; Doc. No. 105-1 at 11-12.)  In her declaration, Defendant Finander states that there is no treatment that will reverse chronic cirrhosis that has been proven effective in the English language evidence based peer reviewed medical literature. (Doc. No. 105-5, Finander Decl. ¶21.)  Plaintiff testified at his deposition that he does not know what treatment for cirrhosis is appropriate because he is not a doctor. (Doc. No. 105-6, Ex. A, Moody Depo. at 119:1-14.)  Although there is no treatment to reverse cirrhosis, those with cirrhosis of the liver must avoid liver toxins. (Doc. No. 105-5, Finander Decl. ¶21.)  The evidence provided by Plaintiff supports this, as the CDCR policy states under cirrhosis management that those with cirrhosis should eat from the CDCR low salt, low fat, heart healthy diet, avoid high salt, high fat food from canteen or packages, abstain from alcohol and avoid iron supplements.[9]  (Doc. No. 119-8, Ex. D at 28.)

Additionally, if the underlying problem damaging a liver can be treated, progression of the disease can be stopped. (Doc. No. 105-5, Finander Decl. ¶21.)  The medical records presented indicate that Plaintiff's cirrhosis is from both alcohol abuse[10] and Hepatitis C. Damage done by alcohol cannot be reversed. (Doc. No. 105-5, Finander Decl. ¶21; Doc. No. 119-10, Ex. F at 7.)  Plaintiff's Hepatitis C can be treated with regulated Interferon and Ribivarin, which requires approximately 48 weeks of treatment and has an approximately 25% to 35% cure rate. (Doc. No. 105-5, Finander Decl. ¶21.)  Plaintiff's allegations regarding Dr. Finander's treatment of his Hepatitis C is discussed above.  Accordingly, there is no evidence

---

[9] The record is unclear as to whether Plaintiff's primary care physician advised him of the dietary recommendations for inmates with cirrhosis.  In any event, Plaintiff has not offered any evidence that Defendant Finander had any personal involvement in his dietary decisions and has not argued as such.  *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979) (holding liability under §1983 arises upon a showing of personal participation by a defendant).

[10] Plaintiff disputes this characterization and argues that his cirrhosis is non-alcohol induced. The medical records provided support that Plaintiff's cirrhosis is related to alcohol abuse. (Doc. No. 105-3, Exs. D at1; F at 1; Doc. No. 122-4, Exs. B at 14; C at 17. )

submitted to establish a genuine issue of material fact that Dr. Finander was deliberately indifferent for failing to provide Plaintiff with an unknown treatment for cirrhosis.  The Court recommends granting the motion for summary judgment as to this claim against Defendant Finander.

**B.  Plaintiff's Claims against Defendant Ball**

Plaintiff alleges that Defendant Ball violated his Eighth Amendment right to adequate medical care by intentionally ignoring the recommendation to biopsy the right liver mass, failing to cause further testing given the reports from Alvarado, and failing to treat Plaintiff for Hepatitis C and cirrhosis.  Defendant Ball also does not argue that Plaintiff's claims do not meet the objective prong of an Eighth Amendment claim.  Rather, Defendant Ball's arguments concern the subjective prong, whether any delay was harmful, and administrative exhaustion of remedies.  (Doc. No. 105-1 at 12-15.)

**1.  Failure to Biopsy Right Liver Mass and Further Testing**

Plaintiff claims that Defendant Ball ignored the recommendation to biopsy the right liver mass and failed to order further testing based on discrepant test results.  Defendant Ball argues this claim fails because competent tests were performed and Plaintiff does not have liver cancer.  (Doc. No. 105-1 at 13.)

The evidence presented to the Court demonstrates that Defendant Ball did not ignore the recommendation for a follow-up biopsy, as Plaintiff alleges in his FAC.  In response to a letter Plaintiff wrote to Defendant Ball, Defendant Ball arranged for Dr. Hjerpe to review what happened with the biopsy and arranged for Plaintiff to be transferred to Alvarado Hospital for further testing to rule out liver cancer.  (Doc. No. 105-3, Ball Decl. ¶¶4-5.) The January 11, 2009 CT scan at Alvarado showed that no right liver mass was present, and therefore a biopsy was not needed. (*Id.*, Ex. D.)  On January 22, 2009, Plaintiff received further testing at Alvarado, including an MRI, which again showed that no right liver mass was present.  (*Id.*, Exs. E & F.) Plaintiff has not submitted evidence to contradict that Defendant Ball responded to his concerns regarding the September 19, 2008 biopsy recommendation.  The evidence submitted does not give rise to a triable issue of fact regarding Defendant Ball's mental attitude

- 23 -

in treating Plaintiff as it shows that Defendant Ball acted deliberately in responding to Plaintiff's concerns over the biopsy recommendation.  Furthermore, there is no evidence that Plaintiff suffered any harm as a result of Defendant Ball's response to the biopsy recommendation. *See McGuckin*, 974 F.2d at1060.   The medical evidence submitted demonstrates that since Dr. Ball's care of Plaintiff,  no diagnosis of hepatocellular carcinoma has been made.

Plaintiff's claim that Defendant Ball was deliberately indifferent to his serious medical needs by failing to order further testing given discrepant test results is similarly unsupported by the record.  Under Defendant Ball's care, Plaintiff was twice sent to Alvarado Hospital for evaluation of his liver concerns.  The January 11, 2009 CT scan showed no right liver mass. (Doc. No. 105-3, Ball Decl., Ex. D.) On January 19, 2009, Dr. Stepke reviewed the Alvarado test results and ordered a follow-up MRI given the discrepant CT findings from August 4, 2008 and January 11, 2009.  (Doc. No. 119-15, Ex. at 11.)  On January 20, 2009, Plaintiff returned to Alvarado and on January 22, 2009 received the follow-up MRI.  (Doc. No. 105-3, Ball Decl. ¶7, Exs. E & F.) The January 22, 2009 MRI also showed no right liver mass.  (*Id.*, Ex. E.) Defendant Ball submits the declaration of Dr. Bogle, an expert in radiology, to support the non-existence of a mass.  (Doc. No. 105-7, Ex. B, Bogle Decl. ¶1.)  Dr. Bogle avers that he independently reviewed both tests and concurs with their findings of no liver mass present. (*Id.* ¶¶15-16.)  Plaintiff has not submitted any contradictory medical evidence that these tests were incompetently performed or were not accurate.   Plaintiff received further testing following the Alvarado CT scan that showed no right liver mass and Plaintiff's difference of opinion with his doctors over the need for further testing does not constitute deliberate indifference. *Jackson*, 90 F.3d at 332. Additionally, there is no evidence that Plaintiff suffered any harm as a result of a failure of Dr. Ball to order further testing regarding a liver mass, as Plaintiff has received 5 CT scans since Dr. Ball's care and no diagnosis of hepatocellular carcinoma has been made.

Because the evidence demonstrates Defendant Ball acted appropriately with respect to Plaintiff's concerns about the recommendation for a follow-up biopsy and the Alvarado test

results, the Court finds no genuine issues of material fact exist as to whether Defendant Ball was deliberately indifferent to Plaintiff's liver cancer concerns.  Accordingly, the Court recommends granting the motion for summary judgment as to these claims against Defendant Ball.

### 2.  Failure to Treat Plaintiff's Hepatitis C

In his deposition, Plaintiff also claimed that Defendant Ball was deliberately indifferent to his serious medical needs by failing to treat Plaintiff's Hepatitis C.  Defendant Ball argues that there is no evidence that she knew of this condition and deliberately ignored it.  (Doc. No. 105-1 at 14.)  In support of this argument, Defendant Ball avers that she was not Plaintiff's treating physician, never examined or met Plaintiff, and never knew that he wanted to begin treatment for Hepatitis C.  (Doc. No. 105-3, Ball Decl. ¶10.)  Plaintiff offers no contradictory evidence that Defendant Ball was his primary care physician nor that Defendant Ball knew of Plaintiff's desire to begin treatment for Hepatitis C.  The Court finds that the evidence submitted fails to raise a triable issue of fact that Defendant Ball was subjectively aware of Plaintiff's desire to begin Hepatitis C treatment and intentionally denied his access to that treatment.  *See McGuckin*, 974 F.2d at 1060.  There is no evidence that Defendant Ball personally participated in any decision regarding treatment for Plaintiff's Hepatitis C.  *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979) (holding liability under §1983 arises upon a showing of personal participation by a defendant).

Additionally, Defendant Ball argues that there is no evidence that a failure to start Plaintiff on Hepatitis C treatment while he was incarcerated at Calipatria for approximately three months caused him any harm.  (Doc. No. 105-1 at 14.)  The Court agrees.  As discussed in relation to Plaintiff's claim against Defendant Finander, Dr. Finander avers that in 2008, Plaintiff had other medical issues, including hypertension, heart condition, recently diagnosed diabetes, and blood in his stool, which prevented Plaintiff from beginning the Hepatitis drugs that have serious side effects.  (Doc. No. 105-5, Finander Decl. ¶21.) Plaintiff submits the Inmate Medical Services Polices and Procedures Hepatitis C Chronic Care Program, which sets forth that an absolute contraindication of Hepatitis C treatment is "life determining

illnesses," including poorly controlled cardiopulmonary diseases and diabetes mellitus.  (Doc. No. 119-8, Ex. D.)  Dr. Moon, a doctor at California State Prison-Corcoran, concluded in June 2009 that Plaintiff had absolute contraindications to starting Hepatitis C treatment.  (Doc. No. 119-25, Ex. O5 at 7-8.)  Therefore, a failure to start Plaintiff on Hepatitis C treatment during his stay at Calipatria from December 4, 2008 to March 12, 2009 did not cause Plaintiff any harm as he did not meet the criteria to begin such treatment.

Based upon the evidence submitted, there are no genuine issues of material fact as to whether Defendant Ball acted with deliberate indifference in failing to treat Plaintiff's Hepatitis C and as to whether Plaintiff suffered any harm as a result of such failure. Accordingly, the Court recommends granting the motion for summary judgment on this claim against Defendant Ball.

### 3.  Failure to Treat Plaintiff's Cirrhosis

Defendant Ball argues that she cannot be liable for failing to treat Plaintiff's cirrhosis because there is no treatment for cirrhosis and there is no evidence that any failure to treat Plaintiff's cirrhosis caused Plaintiff any harm. (Doc. No. 105-1 at 15.) Dr. Finander avers that there is no know treatment to reverse cirrhosis.  (Doc. No. 105-5, Finander Decl. ¶21.) Plaintiff testified at his deposition that he does not know what treatment for cirrhosis is appropriate because he is not a doctor.  (Doc. No. 105-6, Ex. A, Moody Depo. at 119:1-14.) Plaintiff offers no contradictory medical evidence that a treatment for chronic cirrhosis exists. Accordingly, there is no evidence submitted to establish a genuine issue of material fact that Dr. Ball was deliberately indifferent for failing to provide Plaintiff with an unknown treatment for cirrhosis.  The Court recommends granting the motion for summary judgment as to this claim against Defendant Ball.

### 4.  Failure to Exhaust Administrative Remedies

Defendant Ball asserts that all of Plaintiff's claims against her fail because he failed to exhaust his administrative remedies.  In support of Defendant Ball's position, she submits the declaration of M.E. Banaga-Bugarin, the health care appeals coordinator at Calipatria who receives inmate appeals, tracks responses, and keeps records regarding those appeals.  (Doc.

No. 105-4, Banaga-Bugarin Decl. ¶1.) Banaga-Bugarin avers that he/she reviewed the medical appeals filed by Plaintiff and Plaintiff filed six appeals related to his medical issues at Calipatria. (*Id.* ¶¶1-2.) Based upon these records, Banaga-Bugarin declares that it is clear that Plaintiff did not exhaust any administrative appeals related to any complaints regarding his liver or treatment of any conditions related to his liver at Calipatria State Prison. (*Id.* ¶5.)

Because the Court finds that Plaintiff's claims against Defendant Ball fail on their merits, the Court will not address whether they alternatively fail based on a failure to exhaust administrative remedies.

### VI. Conclusion and Recommendation

For the reasons set forth above, the undersigned Magistrate Judge recommends that Defendants Finander and Ball's motion for summary judgment be **GRANTED**. This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636 (b)(1).

**IT IS HEREBY ORDERED** that no later than **September 8, 2011**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **September 22, 2011**.

**IT IS SO ORDERED**.

DATED: August 25, 2011

_____
**BERNARD G. SKOMAL**
United States Magistrate Judge